# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Inez Waugh, : 
  Petitioner : 
 : 
  v. : No. 702 C.D. 2016
 : Submitted: September 30, 2016
Workers' Compensation Appeal : 
Board (St. Mary Medical Center), : 
  Respondent : 

BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
 HONORABALE JULIA K. HEARTHWAY, Judge
 HONORABLE DAN PELLEGRINI, Senior Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON** **FILED:  April 13, 2017**

Petitioner Inez Waugh (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board), affirming the decision of a Workers' Compensation Judge (WCJ), which denied Claimant's reinstatement petition (Petition). We now affirm the Board's order.

The following facts are not in dispute. Claimant was formerly employed as a certified nursing assistant (CNA) for St. Mary's Medical Center (Employer). On or around January 26, 2012, Claimant was injured during the course of her employment by a patient who grabbed and twisted her arm. Employer issued a notice of temporary compensation payable (NTCP), dated February 13, 2012. Claimant underwent two surgeries to correct the injury and

returned to light duty work with Employer on April 12, 2012. At that time, Employer revoked the NTCP and issued a notice of compensation denial (NCD).[1]

On May 28, 2014, Claimant was assisting two phlebotomists who were attempting to draw blood from a patient. Vondell Schools (Schools), a registered nurse, witnessed Claimant palpating the patient's arm in an attempt to find a vein from which the phlebotomists could draw blood. Schools informed Claimant that she was acting outside the scope of her job duties in violation of Employer's policy. Later that same day, Schools reported the incident to Claimant's supervisor, Kathleen Muller (Muller). Muller called Claimant into her office where she instructed Claimant that she was suspended effective immediately and was to leave work for the day. On May 29, 2014, Employer issued a corrective action notice indicating that it was terminating Claimant's employment for performing procedures outside the scope of her employment, specifically "plac[ing] tourniquet on [a] patient looking for IV access." (Reproduced Record (R.R.) at 99a). In the corrective action notice, Employer noted that the May 28, 2014 incident was not the first time Claimant had acted outside of the scope of her employment. Employer had previously reprimanded Claimant on December 13, 2013, for administering medication to a patient, which was also an action outside of the scope of her employment.[2]

---

[1] It appears that Employer issued an agreement for compensation for left wrist carpal tunnel syndrome that was never signed by Claimant nor properly filed, paid partial disability for the period of May 27, 2012, to June 9, 2012, and from June 24, 2012, to July 5, 2012, and suspended benefits as of October 11, 2012. (WCJ's Decision at 3, Finding of Fact (F.F.) #3.)

[2] With regard to the December 13, 2013 incident, Claimant testified that she administered medicine to an uncooperative patient at the request of a nurse. Claimant, however, did not **(Footnote continued on next page…)**

On June 6, 2014, Claimant filed the subject Petition, seeking reinstatement of compensation benefits and alleging that her disability related to her arm injury had reoccurred.[3] Employer opposed Claimant's Petition, arguing that Claimant's own bad faith conduct of performing actions beyond the scope of her employment in violation of Employer's policy was the cause of her loss of earnings rather than her work injury.

At a hearing, the WCJ heard testimony from Claimant, Muller, and Schools. Claimant conceded that administering medication and drawing blood were outside the scope of her employment, but she also stated that she did not draw blood or intend to draw blood. (*Id.* at 12a-13a, 21a.) Claimant testified that she did not ask for a needle. (*Id.* at 23a.) Muller testified that, although Employer's policy did not specifically address whether a CNA could apply a tourniquet, Employer's policy in the event that the phlebotomists could not locate a vein is to call in a specialized IV team to insert the needle and draw blood. (*Id.* at 57a.) She also stated that she considers the act of applying the tourniquet and palpating for a vein to be the practice of phlebotomy and, thus, a violation of Employer's policy. (*Id.* at 55a-56a.) Muller also noted that there are potential risks associated with improper use of a tourniquet, such as an increase in the likelihood of blood clots. (*Id.* at 56a.) Schools testified that she saw Claimant sitting beside the patient and

---

**(continued…)**

contest that administering medication was outside the scope of her employment or that the December 13, 2013 reprimand was otherwise invalid.

[3] At approximately the same time, Claimant applied for and received unemployment benefits. Claimant testified that Employer had also contested her application for unemployment benefits, although documentation of her application is not in the record.

3

palpating for a vein while the phlebotomists stood in the doorway to the room. (*Id.* at 67a.) Schools stated that she heard Claimant request a butterfly needle, an instrument used to draw blood, after Schools had already told her to stop. (*Id.* at 70a-71a) Regardless of who requested the needle, Schools testified that she again instructed Claimant to stop attempting to draw blood, and Claimant removed the tourniquet. (*Id.* at 67a.) Schools further stated her opinion that the practice of phlebotomy begins with the application of the tourniquet, and, thus, Employer's policy would prohibit a CNA from applying a tourniquet. (*Id.* at 74a.) She explained that applying a tourniquet is part of phlebotomy because "[t]he only time you would use a tourniquet is to expand the blood in order to inject an IV, to draw blood, [or] to put [in] an INT." (*Id.*) Additionally, at the September 23, 2014 hearing, the parties stipulated that the application of a tourniquet was part of the practice of phlebotomy. (*Id.* at 77a.)

By decision circulated on February 17, 2015, the WCJ concluded that Claimant's lost wages were directly attributable to her being fired for violation of the hospital's policy. In so doing, the WCJ found, in part, that "[o]n May 28, 2014, Claimant assisted two phlebotomists by tying a tourniquet and palpating for a vein of a patient when a registered nurse told her to stop." (R.R. at 109a, WCJ's Decision at 6, Finding of Fact (F.F.) #14.) The WCJ also found that Employer terminated Claimant the following day for "working beyond her job description" and that "Claimant's loss of earnings as of May 29, 2014 was not related to her work injury and was caused by Claimant's own bad faith conduct of exceeding her job description." (*Id.*) The WCJ observed that "[a] paramount concern for the hospital is the safety of the patient and it is appropriate to strongly enforce the protocol of employees acting strictly within the scope of [their] job."

4

(*Id.*) In support of his conclusion, the WCJ reasoned that because Employer discharged Claimant for her own bad faith conduct, Employer was not liable for wage loss benefits as of the date of Claimant's termination. The WCJ further reasoned that the act of applying a tourniquet is part of the process of drawing blood, and, therefore, Employer's policy prohibits a CNA, such as Claimant, from applying a tourniquet. As a result, the WCJ denied Claimant's Petition.

Claimant appealed the WCJ's decision to the Board, arguing that the WCJ did not issue a reasoned decision, committed errors of law, and made findings of fact not supported by substantial evidence. By opinion and order dated April 6, 2016, the Board concluded that the WCJ properly held that Claimant's loss of wages was due to her own bad faith conduct in the form of knowingly violating Employer's policy. Accordingly, the Board affirmed the WCJ's decision.

Claimant petitioned this Court for review of the Board's decision,[4] arguing that the Board erred in affirming the WCJ's determination that Claimant was discharged for violating Employer's policies in bad faith. Specifically, Claimant argues that substantial evidence does not exist to support the WCJ's

---

[4] In reviewing an appeal from a decision of an administrative agency, our scope of review is limited to determining whether any constitutional rights have been violated, whether any errors of law exist, or whether necessary findings of fact are supported by substantial evidence. *Philadelphia Newspapers, Inc. v. Workers' Comp. Appeal Bd. (Guaracino)*, 675 A.2d 1213, 1215 (Pa. 1996). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a finding. *Mrs. Smith's Frozen Foods Co. v. Workmen's Comp. Appeal Bd. (Clouser)*, 539 A.2d 11, 14 (Pa. Cmwlth. 1988). Additionally, in accordance with our Supreme Court's decision in *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478 (Pa. 2002), we may also review a WCJ's decision for capricious disregard of material, competent evidence as a component of our appellate review when a party has properly presented such an issue to the Court. *Wintermyer*, 812 A.2d at 487.

5

findings that (1) applying a tourniquet constitutes the practice of phlebotomy and (2) she acted in bad faith. Claimant contends that, because substantial evidence does not exist to support those findings, the Board erred in concluding that she failed to meet her burden to prove entitlement to a reinstatement of benefits.

In order to prevail on a petition for reinstatement of workers' compensation benefits, a claimant seeking a reinstatement of suspended benefits "must demonstrate: (1) that his earning power is once again adversely affected by his disability through no fault of his own, and (2) that the disability which gave rise to his original claim continues." *Stevens v. Workers' Comp. Appeal Bd. (Consolidation Coal Co.)*, 760 A.2d 369, 374 (Pa. 2000). Once a claimant has established a loss of earnings, an employer may rebut a claimant's proof of loss by showing "'that suitable work was available or would have been available but for circumstances which merit allocation of the consequences of [a] discharge to the claimant,'" such as a lack of good faith on the part of the claimant. *Shop Vac Corp. v. Workers' Comp. Appeal Bd. (Thomas)*, 929 A.2d 1236, 1240 (Pa. Cmwlth. 2007) (quoting *Vista Int'l Hotel v. Workmen's Comp. Appeal Bd. (Daniels)*, 742 A.2d 649, 658 (Pa. 1999)). In *Shop Vac,* we considered "lack of good faith" and "bad faith" to be equivalent, and we observed that "[a] showing of a lack of good faith, or bad faith, on the part of the claimant, is not the same as the willful misconduct standard sufficient to deny unemployment compensation."[5] *Id.*

---

[5] If an employer establishes willful misconduct under the standards for unemployment compensation, it has presented sufficient evidence to preclude a reinstatement of benefits. *Shop Vac*, 929 A.2d at 1240. Willful misconduct in the context of unemployment compensation benefits is a stricter standard than "bad faith" for purposes of reinstatement. *Virgo v. Workers' Comp. Appeal Bd. (Cnty. of Lehigh-Cedarbrook)*, 890 A.2d 13, 19 (Pa. Cmwlth. 2005). In the
**(Footnote continued on next page…)**

6

Benefits will be not reinstated if an employer establishes some bad faith conduct on the part of the claimant caused the discharge, because then the claimant cannot establish that the loss of earning power was "through no fault of [her] own." *Stevens*, 760 A.2d at 374. With regard to termination of employment based upon the violation of an employer's policy, we further explained:

> When an employer terminates a claimant for a violation of a company policy, it must present conclusive evidence that the claimant violated that policy in order to rebut any loss of earnings as being through no fault of her own. *Whether a claimant is terminated for conduct tantamount to bad faith is a factual determination to be made by the WCJ*.

*Shop Vac Corp.*, 929 A.2d at 1240 (emphasis added) (internal citations omitted).

First, we will consider Claimant's argument that substantial evidence does not exist to support the WCJ's finding that applying a tourniquet constitutes the practice of phlebotomy.[6] As noted by the WCJ, counsel for both parties stipulated at the September 23, 2014 hearing that applying a tourniquet is used in

---

**(continued…)**

unemployment context, "[i]n a case involving a work rule violation, the employer must establish both the existence of a reasonable work rule and its violation." *Shop Vac Corp.*, 929 A.2d at 1240. "If the employer proves the existence of the work rule, the reasonableness of the work rule, and the fact of its violation, the burden of proof shifts to the claimant to prove she had good cause for her actions." *Id*. at 1241.

[6] The WCJ is the ultimate fact finder in workers' compensation cases, and we are bound by the WCJ's findings of fact if they are supported by substantial evidence. *General Electric Co. v. Workmen's Comp. Appeal Bd. (Valsamaki)*, 593 A.2d 921, 924 (Pa. Cmwlth.), *appeal denied*, 600 A.2d 541 (Pa. 1991). It does not matter that there is evidence of record which could support a finding contrary to that made by the WCJ, the only inquiry is whether there is evidence of record which supports the WCJ's finding. *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Products Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998).

phlebotomy. (R.R. at 77a, 109a.) Additionally, Muller and Schools testified before the WCJ that the application of a tourniquet was considered part of the practice of phlebotomy for purposes of the application of Employer's policy against CNAs performing procedures outside of the scope of their employment. (*Id.* at 57a-59a, 73a-74a.) The WCJ found their testimony credible and adopted the parties' stipulation that phlebotomy involves the application of a tourniquet. Thus, the WCJ's finding that applying a tourniquet constitutes the practice of phlebotomy is supported by substantial evidence.[7]

Next, we will consider Claimant's argument that substantial evidence does not exist to support the WCJ's finding that Claimant acted in bad faith,

---

[7] We note that Claimant does not challenge in her brief the portion of finding of fact number 14 that "there is little controversy that she placed the tourniquet on the patient and was palpating veins which are the initial steps in phlebotomy." (R.R. at 109a.) Thus, this finding is conclusive and binding on the Court upon review. *Salamak v. Unemployment Comp. Bd. of Review*, 497 A.2d 951, 954 (Pa. Cmwlth. 1985). Moreover, Claimant's first argument actually presumes that she did place the tourniquet on the patient's arm, because Claimant argues that substantial evidence does not exist to support the WCJ's finding that applying a tourniquet constitutes the practice of phlebotomy. The only other finding that she challenges is the finding that she acted in bad faith. Furthermore, the dissent misstates Claimant's testimony. Claimant did not testify that she did not place the tourniquet on the patient's arm. Rather, Claimant's testimony is ambiguous, as it could be interpreted as she placed a tourniquet on the patient's arm, the phlebotomists had placed a tourniquet on the patient's arm while they were attempting to draw blood, or merely that a "tourniquet was on the arm" while she was feeling for a vein. (R.R. at 22a.) In addition, the WCJ received into evidence for the purpose of making findings of fact, without objection from counsel, a statement from one of the phlebotomists present during the incident. The phlebotomist's statement provides, in part, that "[Claimant] placed the tourniquet on the patient's right arm and was trying to see if she found anything, which she did." (R.R. at 94a.) Thus, even if Claimant had preserved and raised a challenge to the finding that Claimant "placed the tourniquet on the patient," which she did not, substantial evidence of record exists to support the finding. Thus, the dissent's main premise—that substantial evidence does not exist that Claimant engaged in the conduct for which she was discharged (*i.e.*, placing a tourniquet on a patient's arm and looking for IV access)—is simply without merit.

8

because she reasonably believed that her actions were within the scope of her employment. Claimant takes the position that, even if she did violate Employer's policy, she did not know that her actions were in violation of that policy, and, therefore, her actions were not in bad faith. Claimant concedes that the policy against CNAs performing procedures outside of the scope of their employment exists and does not argue that the rule was unreasonable. Instead, Claimant asserts that if Employer proved the violation, her violation should be excused because she did not know that her conduct constituted a violation of the policy.

As stated above, the determination of whether a claimant was terminated for bad faith conduct is a factual determination for the WCJ. Here, the WCJ concluded that "Claimant's loss of earnings as of May 29, 2014 was not related to her work injury and was caused by Claimant's own bad faith conduct of exceeding her job description." (R.R. at 109a). As previously noted, the WCJ's finding that applying a tourniquet was part of the practice of phlebotomy is based on substantial evidence, and Claimant does not contest that she actually applied a tourniquet to a patient. The WCJ also considered Claimant's testimony that she believed that applying the tourniquet did not constitute working beyond the scope of her employment, as well as Muller's and Schools' testimony that they both considered the application of a tourniquet to be part of the practice of phlebotomy. The WCJ found Muller's and Schools' testimony persuasive, and the WCJ credited their testimony over the testimony of Claimant to the extent that a conflict existed. In finding that Claimant acted in bad faith, it appears that the WCJ discredited Claimant's testimony that she believed that applying a tourniquet fell within the scope of her duties. We note that Claimant does not argue that there was an emergency requiring her to apply the tourniquet, thereby justifying her violation of

9

the policy. Moreover, Muller testified that there was a set procedure in place in the event that the phlebotomists could not properly find a vein: call in an IV team to draw blood. Claimant chose to act outside the normal procedure. For these reasons, we conclude that substantial evidence exists to support the WCJ's finding that Claimant acted in bad faith.

Claimant's argument that the WCJ and Board erred as a matter of law are dependent upon this Court concluding that substantial evidence does not exist to establish that Claimant violated Employer's policy and that she did so in bad faith. Because we concluded that the WCJ's findings are supported by substantial evidence, Claimant's argument must fail.

Accordingly, we affirm the Board's order.

_____
P. KEVIN BROBSON, Judge

10

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Inez Waugh, : 
                Petitioner :
             :
           v. : No. 702 C.D. 2016
             :
Workers' Compensation Appeal :
Board (St. Mary Medical Center), :
               Respondent :

## **O R D E R**

AND NOW, this 13th day of April, 2017, the order of the Workers'
Compensation Appeal Board is affirmed.

_____
P. KEVIN BROBSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Inez Waugh, : 
                Petitioner : 
  : 
        v. :   No. 702 C.D. 2016
  :   Submitted: September 30, 2016
Workers' Compensation Appeal : 
Board (St. Mary Medical Center), : 
             Respondent : 


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
              HONORABALE JULIA K. HEARTHWAY, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


DISSENTING OPINION
BY SENIOR JUDGE PELLEGRINI         FILED: April 13, 2017


I respectfully dissent with the majority holding that Inez Waugh (Claimant) is not entitled to have her workers' compensation benefits reinstated to compensate her for work-related loss of earning power due to her inability to use her arm because she acted in "bad faith" by violating the St. Mary Medical Center's (Employer) "Nursing Department Scope of Practice." I do so because Employer failed to show that Claimant in any way violated that policy or otherwise acted in "bad faith."

Claimant was employed by Employer for 13 years as a nursing assistant. In January 2012, a patient grabbed and twisted her arm causing injuries so severe that

Claimant had to undergo two corrective surgeries. In April 2012, she returned to light-duty work in a specially-created position because, even after the surgeries, Claimant was not permitted to use her injured arm. Now to the incident that led to Claimant's termination.

On May 28, 2014, Claimant was assisting two phlebotomists who were attempting to draw blood from a patient. After both phlebotomists were unsuccessful in their attempt to draw blood, Claimant offered to help raise a vein so the phlebotomists could draw blood. Vondell Schools (Nurse Schools), a registered nurse, the only Employer witness who offered direct testimony about the incident itself, only observed Claimant patting the patient's arm in an attempt to find a vein from which the phlebotomists could draw blood.[1] The email statement of Janice Dalton, one of the phlebotomists, was placed in the record and offers the most complete version of what occurred, although it is the only evidence in the record that states that Claimant applied the tourniquet. It states:

> Nikki [the other phlebotomist] asked me to get a miss on her side in room 26IA. When I walked in the patient had a one on one sitting, Inez, sitting next to her in the chair. The patient was in a chair with her feet up. I explained why I was there and tried to get the patient's blood. First I stuck her in her left arm above her cast and could only get a flash. Then I stuck her in her right arm below her IV and wasn't able to get anything. Nikki had come back to check on me

---

[1] Claimant testified that the phlebotomist was unable to draw blood and she stated, "let me see if I could find a vein and I proceeded to touch the patient's arm to see if I could find a find a vein . . . ." (Reproduced Record (R.R.) 12a.) On cross, Claimant admitted that when she was palpating the arm, there was a tourniquet, but she was not asked whether she placed it on the patient's arm or if it was left there as a result of the unsuccessful efforts of the two phlebotomists who attempted to draw blood.

and came in the room since I was still in there. The one on one, Inez, said she would take a look. RN Vondell came into the room. Inez tied the tourniquet on the patient's right arm and was trying to see if she found anything, which she did. RN Vondell asked Inez what she was doing. Nikki felt the vein and stuck the patient while Inez and Vondell were talking. I stood over the patient's feet waiting to change tubes if Nikki was able to get blood. No blood came out. Nikki told Vondell that both her and I had tried and we weren't able to get her labs and she would have to call the IV team. The only people to stick this patient were Nikki and I.

Thank you!

(Reproduced Record (R.R.) 94a.)

Because she believed Claimant was purportedly acting outside the scope of her duties, Nurse Schools reported the incident to her Supervisor who suspended Claimant immediately. The next day, on May 29, 2014, through Kathleen Muller, a Nurse Manager, Employer issued a "corrective action notice" terminating Claimant's employment for performing procedures outside the scope of her employment, specifically, because she "placed a tourniquet on patient looking for IV access." (R.R. 99a.) Nurse Schools later testified that while phlebotomy was the act of drawing blood, she believed the steps for preparing to draw blood are proscribed under Employer's "Nursing Department Scope of Practice." The corrective action notice did not state as a reason for the termination that Claimant's conduct in patting the patient's arm was outside the scope of her duties. The corrective action notice also noted that on December 13, 2013, Claimant had acted outside the scope of her employment by administering medication, but it failed to state that Claimant

administered the medication at the express direction of a nurse when the patient refused to take the medication from the nurse.

Both of these "corrective actions" were issued after the creation of the special position necessitated by Claimant's injuries, notwithstanding that in the 13 years she worked for Employer, she received "above average" evaluations. Also, Claimant applied for and received unemployment compensation benefits even though they were contested by Employer.

Claimant then sought reinstatement of her workers' compensation benefits which Employer contested, arguing that any loss of earning power was due to Claimant's own bad faith conduct of performing actions beyond the scope of her employment in violation of Employer's "Nursing Department Scope of Practice" policy, and this was the cause of her loss of earnings rather than her work injury. The workers' compensation judge (WCJ) denied the reinstatement petition finding that Claimant violated the policy when she "placed the tourniquet on the patient and was palpating for a vein which are the initial steps in phlebotomy." (R.R. 109a.) After Claimant appealed, the Board affirmed.

The majority finds Employer made out its claim that Claimant was acting in "bad faith" by applying the tourniquet and palpating the veins of a patient because she purportedly acted outside the scope of her employment as provided for in the "Nursing Department Scope of Practice." I disagree with the majority because Employer did not establish "bad faith" on Claimant's part because it failed to "conclusively" establish that the conduct of applying a tourniquet violated its policy.

"For a termination to bar disability benefits, the employer must show that the termination was for conduct that amounts to bad faith or a lack of good faith on the part of the claimant." *BJ's Wholesale Club v. Workers' Compensation Appeal Board (Pearson),* 43 A.3d 559, 563 (Pa. Cmwlth. 2012). *See also Virgo v. Workers' Compensation Appeal Board (County of Lehigh-Cedarbrook),* 890 A.2d 13, 19 (Pa. Cmwlth. 2005) (holding that where a claimant is discharged from employment, "some 'bad faith' willful misconduct on the part of the claimant that caused the discharge has to be established or benefits will not be suspended or will be reinstated.").

There is no dispute that Claimant was attempting to advance Employer's and patient's interests when she was attempting to help the phlebotomists find a vein. The bad faith that the majority finds is that Claimant's good intentions to help the patient violated Employer's policy because she was acting outside the scope of her duties. "When an employer terminates a claimant for a violation of a company policy, it must present conclusive evidence that the claimant violated that policy in order to rebut any loss of earnings as being through no fault of her own." *Shop Vac Corporation v. Workers' Compensation Appeal Board (Thomas)*, 929 A.2d 1236, 1240 (Pa. Cmwlth. 2007). A person cannot be discharged for violating a policy that does not proscribe the conduct for which that person was discharged.

The "Nursing Department Scope of Practice" is the policy that Employer states that Claimant violated in bad faith. It is a memo that sets forth, in column form, a list of duties for each type of action that takes place in the Nursing

Department and who can perform that action. The column relating to who can perform phlebotomy only provides:

| Specimen Collection and Point of Care Testing | Registered Nurse | Unlicensed Assistant Nursing Personal |
|---|---|---|
| **** | **** | **** |
| Phlebotomy | Yes | Yes*-ED Tech/PeriopNA's |

The policy does not define what constitutes phlebotomy. There is no specific certification or license required for phlebotomists in Pennsylvania so there is no legal definition of what phlebotomy entails. That means the dictionary definition controls because otherwise an employee would have no way of knowing what conduct is proscribed.

Phlebotomy is defined as "Venesection; venetomy; incision of a vein for purpose of drawing blood." Stedman's Medical Dictionary, 1187 (25ed. 1990). Any reasonable person would look to that definition and state the prohibited conduct is sticking a needle in an arm to take blood. No reasonable person would state that it includes getting a needle to draw blood, holding a patient's arm down to take blood, patting the patient's arm or applying a tourniquet, because those actions are not the taking of blood. If Employer wanted to have a different or a more broad definition than the dictionary definition, it was obligated to be more specific in its policy as to what it meant phlebotomy to encompass.

Of course, patting the arm (Claimant was not terminated for that conduct) as well as placing a tourniquet on a patient's arm could be considered the "initial steps" in taking blood, but washing and shaving a patient's body are "initial steps" for surgery and taking those "initial steps" does not somehow make washing and shaving a patient's body surgery. To repeat, phlebotomy is, by definition, the taking of blood. Employer's policy should be interpreted as written and should not be extended to what Employer believes it should say so it can terminate Claimant and relieve itself of its workers' compensation obligations.

Because Employer has not presented conclusive evidence that Claimant took anyone's blood, Claimant did not engage in bad faith conduct by violating a policy and I would reverse. Accordingly, I respectfully dissent.

_____
DAN PELLEGRINI, Senior Judge