**Patricia S. GRIMES, Petitioner,**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (PROCTOR & GAMBLE), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted May 10, 1996.

Decided July 11, 1996.

John Kocsis, for Petitioner.

Brian J. Lenahan, for Respondent.

Before DOYLE and FLAHERTY, JJ., and LORD, Senior Judge.

DOYLE, Judge.

Patricia S. Grimes (Claimant) appeals from an order of the Workmen's Compensation Appeal Board (Board) which denied her benefits for a psychic injury under Section 301(c) of the Workers' Compensation Act (Act).[1]

The relevant facts as found by the Workers' Compensation Judge (WCJ) may be summarized as follows. Claimant began working for the Proctor and Gamble Paper Products Company (Employer) in 1972 as a technician on the production line manufacturing disposable diapers. From 1972 to 1977, Claimant was promoted several times and rose to the level of "Technician 3." Claimant remained in that position for approximately eleven years, at which time she began a probationary/training period as a "Technician 4," a position that was the most advanced promotion on the production line and which required leadership and supervision over other employees as well as more advanced technical and mechanical skills. Unfortunately, for a myriad of reasons, Claimant was unable to successfully make the transition from a "Technician 3" to a "Technician 4."

Claimant "did not feel she was receiving adequate training or support from her superiors while her subordinates or co-workers resented her efforts to move up in the organization." (WCJ's Finding of Fact No. 13.) Claimant also complained to her superiors that other employees ignored her directions and taunted her. In a subsequent investigation by Employer of two of Claimant's co-workers,[2] Employer determined that these two workers "often used foul and or derogatory language[3] and did not give adequate support or respect to their co-workers." (WCJ's Finding of Fact No. 8.) The behavior of these particular co-workers was so outrageous that Employer took disciplinary action against them.[4] Jeanine Lyle, a department line manager for Employer, testified that although the use of some foul language is common in a manufacturing setting, the behavior of Claimant's two co-workers was

---

1. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411.

2. The investigation was prompted by a grievance filed by Claimant with Employer.

3. One of Claimant's co-workers was found by Employer to have uttered the following obscenities and/or derogatory remarks while working on the production line: "The F——— Idiot," "F——— Stupid Idiot," "Fat Bitch," "Fat Mam-

ma," "Wide Load," "F——— A—H———," and "A—H———." (Notes of Testimony (N.T.) at 86; Reproduced Record (R.R.) at 84a.) Although these and other comments were not necessarily all directed specifically at Claimant, Claimant, as a member of the production line, was certainly present to hear at least some of them.

4. Both co-workers were placed on a step 4 disciplinary level, the maximum possible punishment short of termination.

more extreme than normal and "is not typical in the work environment." (N.T. at 126; R.R. at 124a.)

In addition to the stress from her job, Claimant suffered from the emotional effects of having grown up with an alcoholic father and a physically abusive mother. Claimant also indicated that she had been the victim of incest as a child. At the time Claimant was aspiring to become a "Technician 4," she had feelings of depression stemming from a hysterectomy she underwent three years before. Claimant was also experiencing friction in her marriage and in her relationship with one of her daughters. In fact, Claimant told her supervisors that these personal problems contributed to her lack of confidence on the job and made it difficult for her to display the assertiveness and decision making ability necessary in her new position as a "Technician 4."

Because of Claimant's difficulties at work and in her personal life, Employer arranged for her to have counseling with a social worker through its Employee Assistance Program. However, even after receiving counseling, Claimant's situation at work did not significantly improve. By June 12, 1989, it had become obvious to Employer that Claimant was unable to adequately perform in her new position. Accordingly, Employer informed Claimant at that time that, due to her lack of progress, she was being moved back to her former position as a "Technician 3." Immediately after being told of this decision, Claimant became extremely upset, and on the following day, Claimant was hospitalized for depression at the Meadows Psychiatric Center. Claimant remained as an inpatient in that facility until August 11, 1989.

Two weeks following her release from the hospital, Claimant attempted to return to work in a different section of Employer's plant. However, Claimant was emotionally unable to do so and left the plant before completing any work that day. Eventually, on July 9, 1990, Claimant returned to work for Employer in a different department and at a lower weekly wage than she had been receiving prior to her hospitalization.[5] In February of 1993, Claimant terminated her employment.

On December 26, 1989, prior to Claimant's return to work on July 9, 1990, she filed a claim petition in which she alleged that her depression was caused by stress at work. Employer denied Claimant's allegations primarily on the grounds that her injury was not work-related for the purposes of the Act. Hearings were subsequently held before a WCJ between March 1990 and February 1993. In addition to her own testimony, Claimant offered the testimony of two of her fellow employees, Jeanine Lyle and Andrea Sterling, to corroborate her own depiction of the working conditions at Employer's plant.

Claimant also offered into evidence the deposition testimony of Dr. Walter Wigert, a psychiatrist who first examined Claimant in March of 1989. The WCJ characterized Dr. Wigert's diagnosis and treatment of Claimant as follows:

> The history obtained by Dr. Wigert noted that the claimant did not feel she was receiving adequate training or support from her superiors while her subordinates or co-workers resented her efforts to move up in the organization. Dr. Wigert felt this conflict resulted in dysthymia which is neurotic type of depression associated with conflicts. Dr. Wigert was not aware of any other problems in the claimant's life, but stated that she was able to work and function at home and in the community and did not suffer her mental breakdown until confronted with the added stress at work. Dr. Wigert prescribed several forms of therapy and treatment with different medications in an effort to "desensitize" the claimant to her employment and it was best to gradually ease the claimant back into the work force. . . .

(WCJ's Finding of Fact No. 13.)

In rebuttal, Employer offered the deposition testimony of another psychiatrist, Dr.

---

5. Claimant's weekly wage had been $725.57 before she left work in June of 1989. After she returned to work, her weekly wage was $544.80, a difference of $180.77. (WCJ's Finding of Fact No. 6.)

Gladys Fenichel.[6] While Dr. Fenichel concurred with Dr. Wigert that Claimant suffered from a mental breakdown, her opinion differed from that of Dr. Wigert in that she "placed more emphasis on the other pressures in the claimant's life rather than her job because [she] did not find anything unusual about the claimant's work situation." (WCJ's Finding of Fact No. 14.) Dr. Fenichel stated that Claimant's attempt to obtain a position which turned out to be beyond her abilities and the conflict she experienced with recalcitrant co-workers were not at all unusual within a normal work environment. Dr. Fenichel further concluded that "[b]eing the child of an alcoholic father and suffering child abuse, plus undergoing some marital problems, were more stressful and considered together were more likely to lead to a mental breakdown than [Claimant's] work." (WCJ's Finding of Fact No. 14.)

The WCJ accepted Dr. Wigert's testimony over that of Dr. Fenichel to the extent that he attributed Claimant's disability to stress precipitated by conditions at work. By an order dated January 12, 1994, based on the conclusion that "abnormal conditions at work caused [Claimant] to suffer a nervous breakdown or mental disorder," (WCJ's Conclusion of Law No. 2) the WCJ granted Claimant temporary total disability benefits for the period from June 13, 1989 to July 9, 1990. Both Employer and Claimant filed timely appeals from the WCJ's order with the Board. Employer maintained in its appeal that the Board should completely deny Claimant's request for benefits on the grounds that the WCJ erred in finding that Claimant's disability was caused by abnormal working conditions. Conversely, Claimant argued that she was entitled to benefits beyond the time she went back to work since her average weekly wage was lower at that time than before her disability. Claimant further alleged that the WCJ erred in finding that she had voluntarily left her job in February of 1993 and argued that she was entitled to ongoing benefits under the Act.

The Board, in a decision dated November 16, 1995, reversed the WCJ's determination on the grounds that his decision was not supported by substantial evidence. Specifically, the Board concluded that Dr. Wigert's testimony did not constitute unequivocal medical evidence showing that Claimant's disability was causally related to abnormal working conditions at Employer's plant. Claimant appeals the Board's decision to this Court.[7]

On appeal, Claimant raises the following two issues for our review: (1) whether the WCJ's finding that Claimant's psychic injury was caused by abnormal working conditions was supported by substantial evidence in the record; and (2) whether the WCJ erred in completely terminating her benefits as of July 9, 1990, rather than granting her partial disability benefits, when her average weekly wage at that time was less than at the time she was originally disabled.

Claimant's first argument is that the WCJ correctly determined that her mental disability was caused by abnormal conditions in the workplace and that the Board erred in reversing that determination. Initially, we note that the WCJ is the ultimate factfinder in a workers' compensation case, having the sole authority to assess the credi-

---

6. Dr. Fenichel personally examined Claimant on June 3, 1991. In addition, Dr. Fenichel based her medical conclusions on Claimant's medical records from Meadows Psychiatric Center, Dr. Wigert's deposition, and Claimant's own testimony in this case.

Employer also presented the testimony of William LaCoe, a line manager for Employer, and Ted Schone, its employee relations manager, to establish that the work environment was not abnormal, and that Employer did everything possible to accommodate Claimant's psychological needs prior to her own voluntary termination of employment in February of 1993.

7. Our scope of review is limited to determining whether an error of law was committed, whether constitutional rights were violated, or whether necessary findings of fact made by the WCJ are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Magayna v. Workmen's Compensation Appeal Board (Jones and Laughlin Steel Corp.)*, 115 Pa.Cmwlth.268, 539 A.2d 952 (1988).

bility of witnesses and resolve conflicting testimony. *Bethenergy Mines, Inc. v. Workmen's Compensation Appeal Board (Skirpan)*, 531 Pa. 287, 612 A.2d 434 (1992). In the present case, the WCJ accepted the testimony of Claimant's medical expert, Dr. Wigert, over that of Employer's expert, Dr. Finechel. Since we are bound by the WCJ's credibility determination, we must accept Dr. Wigert's testimony as true for the purposes of this appeal.

■ We agree with Claimant that Dr. Wigert's testimony supports the fact that Claimant's mental injury was caused by stress from work. However, while establishing a causal nexus between an injury and the work place is ordinarily sufficient to establish one's entitlement to benefits under the Act, there exists a heightened burden of proof for individuals who wish to recover benefits for purely psychological injuries. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). In the so called "mental/mental" case, a claimant has the burden of proving not only that he or she suffered a work-related injury, but also that the mental injury was the result of *abnormal* working conditions and not simply a subjective reaction to normal events in the work place. *Id.; Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa.Cmwlth.579, 474 A.2d 82 (1984).

In the present case, two of Claimant's co-workers regularly used vulgar and indecent language on the assembly line. While the

use of such language is to be expected in a manufacturing setting, the behavior of these two workers was so atrocious, and deviated so far from Employer's own limits of acceptability, that the maximum punishment possible, short of actually terminating their employment, was imposed by Employer. The indecent behavior of these two co-workers was real and not merely Claimant's own subjective reaction to normal working conditions. Furthermore, the Claimant's account of the behavior of these two co-workers is fully corroborated by her supervisor's testimony as well as Employer's own records. Therefore, we believe sufficient evidence exists to support the WCJ's conclusion that Claimant worked under abnormal conditions.[8]

Unfortunately, there is absolutely no medical evidence connecting Claimant's disability with the abnormal working conditions which existed at Employer's plant, *i.e.*, the verbal harassment of Claimant on the assembly line, including the regular use of profanities, by these two co-workers. A review of Dr. Wigert's testimony reveals that he did not rely upon the conduct of these two co-workers at all in making his diagnosis, but rather attributed Claimant's psychiatric condition to the overall stress from her new job in conjunction with stress related to her personal life. In fact, after having examined Dr. Wigert's entire testimony, we have failed to uncover a single reference to the use of vulgar language by Claimant's co-workers as a precipitating cause of Claimant's mental breakdown. Furthermore, there is nothing in the

8. We note that the Supreme Court recently denied benefits for a psychic injury where the worker was criticized and berated by his supervisors, and where the supervisors used obscene and derogatory language towards him. *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino)*, —— Pa. ——, 675 A.2d 1213 (1996). In *Philadelphia Newspapers, Inc.*, unlike· the present case, the use of obscene language directed at the worker was limited to a single incident and was done outside the presence of co-workers. The Supreme Court thereby limited its holding as follows:

> In assessing whether work conditions are abnormal, we must recognize that the work environment is a microcosm of society. It is not a shelter from rude behavior, obscene language, incivility, or stress. While we do not suggest

that insensitive behavior is socially acceptable in the work place, it is unrealistic to expect that such behavior will not occur. *Where, as here, the evidence demonstrates that the offensive behavior complained of is an isolated incident, we must conclude that an abnormal working condition has not been established.* (Emphasis added.)

*Id.* at 1219. Although we ultimately conclude that Claimant is not entitled to benefits in the present case, our decision today is not controlled by the Supreme Court's decision in *Philadelphia Newspapers, Inc.* since the record demonstrates that the behavior of Claimant's co-workers was not an isolated incident, but constituted a continuing destructive presence within the work place over an extended period of time.

record to suggest that Dr. Wigert even knew, let alone relied upon, the above mentioned use of profanity by Claimant's co-workers in arriving at his medical opinion in this case. Accordingly, we must deny Claimant's request for benefits.

In reaching this conclusion, we rely upon our prior decision in *Lukens Steel Co. v. Workmen's Compensation Appeal Board (Price)*, 149 Pa.Cmwlth.177, 612 A.2d 638 (1992). In *Lukens Steel Co.*, the claimant, a crane operator, suffered from extreme anxiety at work which was caused, at least in part, by the harassment he received from his co-workers and supervisors. Furthermore, these co-workers engaged in "cussing matches" with the claimant. Although we found that such conduct could be viewed as an abnormal working condition, we denied benefits since the testimony of claimant's own doctor did not connect his disability with the harassment by his co-workers so as to prove that his disability was "other than a subjective reaction to normal work conditions." *Id.*, 612 A.2d at 645.

In the present case, we must similarly deny benefits since Claimant failed to present any medical evidence connecting her disability with the abnormal conditions which existed in Employer's plant. While Claimant's disability is obviously quite real, we may not grant benefits to Claimant where she has failed to meet her burden of proof by establishing a causal connection between her "mental/mental" psychic injury and abnormal conditions in the workplace through unequivocal medical testimony.

Accordingly, the order of the Board denying Claimant benefits is affirmed.[9]

### ORDER

NOW, July 11, 1996, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is hereby affirmed.

---

[9]. Since Claimant failed to meet her initial burden of establishing that her psychic injury was caused by abnormal working conditions, she is precluded from receiving any benefits for her disability under the Act. Therefore, it is unnecessary for us to address the other questions raised by Claimant on appeal. Specifically, we need not decide whether the WCJ erred in suspending her benefits when she returned to work at a lower average weekly wage or whether the WCJ erred in finding that she was not entitled to a reinstatement of full benefits in February of 1993 because she voluntarily left her employment at that time.