RAG (CYPRUS) EMERALD
RESOURCES, LP,
Petitioner

v.

WORKERS' COMPENSATION
APPEAL BOARD (HOPTON),
Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 4, 2004.

Decided May 25, 2004.

Valerie S. Faeth, Pittsburgh, for petitioner.

James M. Jacobs, Somerset, for respondent.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge McGINLEY.

RAG (Cyprus) Emerald Resources, LP (Employer) petitions for review from an order of the Workers' Compensation Appeal Board (Board) that affirmed the Workers' Compensation Judge's (WCJ) grant of Ronald A. Hopton's (Claimant) claim petition.[1]

Claimant worked as a beltman in the Cyprus Emerald Mine (Mine). On or about April 12, 1996, Claimant petitioned for compensation benefits and alleged that he "was subject [sic] to harassing comments of a homosexual nature by the employees [sic] mine foreman, Dominic Rossi, on 3 occassions [sic] from July 6 to 13, 1994." Claim Petition, April 12, 1996, at 1; R.R. at 3a. Claimant alleged that he suffered an "[a]ggrevation [sic] of a prior existing condition (Post Traumatic Stress Disorder, P.T.S.D.), resulting in a debilitating anxiety attack, rage, anger, depression and physical pain." Claim Petition at 1; R.R. at 3a. Employer denied the allegations.

Claimant described the bantering that occurred in the Mine. "They [his co-workers] joked as like one guy would jump on another's back and they would say look at those two queers or they would bend over and say someone is going to be jumping you." N.T. 8/14/96 at 64; R.R. at 100a. In addition, Claimant testified about three particular episodes.

*First Episode*

On July 6, 1994, Claimant was working with supplies in the crosscut when Dominic Rossi (Rossi), Mine foreman, called him over to the jeep. Rossi said to Claimant, "[Y]ou have a nice butt, a real nice looking butt, come on up here [in the jeep] and sit down next to me." Notes of Testimony, November 18, 1996, (N.T. 11/18/96) at 28–29; R.R. at 132a–133a. Claimant's co-worker, Allen Vozel, was present. As a result of this episode, Claimant was shaking, and "had a great desire to ... take him [Rossi] out." N.T. 11/18/96 at 30; R.R. at 134a.

*Second Episode*

Claimant testified that on July 8, 1994, Rossi made similar comments and "was very sexually ... aggressive at that time. Very——in words as well as in characteristics, in tone, yes." N.T. 11/18/96 at 31–32; R.R. at 135a–136a. This time, another employee, Joe Ross (Ross), was present. Ross testified that while he was driving Rossi and Claimant in a jeep, Rossi said to Claimant, "I'd like to bend you over a rail, over the jeep and f—— you in the a—— until you bleed." N.T. 8/14/96 at 32; R.R. at 68a. Claimant indicated that this episode triggered flashbacks to Vietnam, and the comments caused him a "great deal of pain." N.T. 11/18/96 at 33 & 34; R.R. at 137a & 138a.

*Third Episode*

On July 13, 1994, Rossi was in a discussion with Terry Rafferty, a belt foreman, and Rossi called Claimant into the office. Rossi said, "[B]oy, doesn't he [Claimant] have a nice pair of legs." N.T. 11/18/96 at 39–40; R.R. at 143a–144a. Claimant told Rossi to stop and left because he wanted to attack Rossi. Claimant elaborated, "As

---

1.  Claimant served in the United States Army from August 1964, through May 1967. He achieved the rank of Specialist, Fourth Class (E–4), and in 1966, he served in a transportation unit in Vietnam. According to Claimant, he was propositioned by his commanding officer. Upon discharge from the service, Claim- ant graduated college, and managed several fast food stores. Claimant started working for Employer in May 1978. *See* Notes of Testimony, August 14, 1996, (N.T. 8/14/96) at 47–62; Reproduced Record (R.R.) at 83a–98a.

I was leaving he [Rossi] said, oh, I know what it is ... how would $5 do...." N.T. 11/18/96 at 40; R.R. at 144a.[2]

Claimant presented the deposition testimony of Greenbrier Almond, M.D. (Dr. Almond), a board-certified psychiatrist employed by the Veterans Affairs Department. Dr. Almond first saw Claimant following his hospitalization from September to October, 1994, and on a monthly basis thereafter. Dr. Almond and Claimant discussed his military service in Vietnam. Dr. Almond noted that Claimant "... was alarmed at some of the homosexual activities that he observed within his units. And he did recall a superior officer who was trying to solicit from his men and other experiences like this." Deposition of Greenbrier Almond, M.D., November 5, 1998, (Dr. Almond Deposition) at 27; R.R. at 720a.

Claimant also described his work in the Mine. Dr. Almond stated that "the incident that brought him [Claimant] to us was following [sic] when a superior made harassing remarks, what he interpreted as harassing remarks to him which lead [sic] to flashbacks to Vietnam." Dr. Almond Deposition at 29; R.R. at 722a. Dr. Almond opined that Claimant suffered from posttraumatic stress disorder (PTSD) "primarily related to his Vietnam experiences. And he had as a secondary stressor his experience in the mine." Dr. Almond Deposition at 32; R.R. at 725a. Dr. Almond

indicated that the work stressor was triggered by comments from his supervisor. Dr. Almond Deposition at 32; R.R. at 725a. Lastly, Dr. Almond noted that Claimant demonstrated many qualities consistent with a person with a paranoid personality disorder. Dr. Almond Deposition at 92; R.R. at 786a.[3]

Employer presented the medical deposition of Lawson F. Bernstein, Jr., M.D. (Dr. Bernstein), board-certified in psychiatry and neurology. Dr. Bernstein evaluated Claimant on two occasions and reviewed his records. Dr. Bernstein noted, "There were substantial differences between his [Claimant's] rendition of the facts and the records that I reviewed." Deposition of Lawson F. Bernstein, Jr., M.D., November 9, 1998, (Dr. Bernstein Deposition) at 30; R.R. at 880a. Moreover, Dr. Bernstein opined that Claimant had a "major depressive disorder with psychotic features" and a paranoid personality disorder. Dr. Bernstein Deposition at 39; R.R. at 889a.[4] Dr. Bernstein stated that Claimant was capable of working. Dr. Bernstein Deposition at 40–41; R.R. at 890–891a. Dr. Bernstein characterized Claimant as a homophobic which was "part and parcel of his paranoid personality disorder." Dr. Bernstein Deposition at 45–46; R.R. at 895a–896a.

At the WCJ's request, Chester M. Berschling, M.D. (Dr. Berschling), a

**2.** As a result of his comments to Claimant, Rossi was disciplined by Employer. Notes of Testimony, December 9, 1997, at 18; R.R. at 339a.

**3.** Claimant also presented the deposition testimony of Herbert Thomas, M.D. (Dr. Thomas), a board-certified psychiatrist. On July 29, 1995, Dr. Thomas first saw Claimant, and he reviewed pertinent medical records. Claimant discussed his work situation and Vietnam experience with Dr. Thomas. Dr. Thomas opined that Claimant has a severe PTSD following his Vietnam experience. Deposition

of Herbert Thomas, M.D., September 11, 1998 (Dr. Thomas Deposition) at 50; R.R. at 628a. Additionally, Dr. Thomas explained that Claimant's condition was aggravated by Rossi's remarks. Dr. Thomas Deposition at 52; R.R. at 630a.

**4.** Dr. Bernstein indicated that Claimant did not have PTSD. Dr. Bernstein did not view the 1994 work episodes as the cause of Claimant's psychiatric problems. Dr. Bernstein Deposition at 40; R.R. at 890a.

board-certified psychiatrist, evaluated Claimant.[5] Dr. Berschling met with Claimant on two occasions in February 1999, and reviewed his records. Dr. Berschling confirmed his opinion regarding Claimant's PTSD that resulted from his Vietnam service. Deposition of Chester M. Berschling, M.D., November 22, 1999, (Dr. Berschling Deposition) at 60; R.R. at 1170a. Dr. Berschling testified:

> JUDGE BLOOM: What effects did the time in the mine in July of 1994, if any have, [sic] on the posttraumatic stress condition suffered by Mr. Hopton?
>
> THE WITNESS: It added fuel to the fire.

Dr. Berschling Deposition at 60–61; R.R. at 1170a–1171a.

The WCJ made the following relevant finding of fact and conclusion of law:

> 18. In reviewing all the psychiatric evidence presented, this Workers' Compensation Judge finds that whether one adopts the theory of Dr. Bernstein or the theories of claimant's treating psychiatrists and Dr. Berschling, the incidents involving Dominic Rossi are the causative factors of the claimant's current disability. Whether the claimant had post-traumatic stress disorder from Vietnam or had a paranoid personality disorder, the main point to this Workers' Compensation Judge is that the claimant was a working, functioning employee in the mines until harassed, aggravated and stirred up by the comments in the series of incidents involving Dominic Rossi. It is immaterial whether he has PTSD or personality disorder, he functioned before the Rossi series of incidents and is unable to function as an employee after the Rossi series of incidents. The incidents were not normal joking or merely uncivil behavior but

were a course of conduct persisted in and clearly calculated to cause severe emotional distress on the part of the claimant and Mr. Rossi was successful in doing this.

. . . .

### CONCLUSIONS OF LAW

. . . .

> 2. The claimant has met his burden of proof to establish by competent and credible evidence that there were abnormal working conditions in the defendant's [Employer's] mind [sic]. The factual situation was more than mere uncivil, crude, joking behavior. It was a course of conduct on the part of a supervisory employee clearly calculated to cause severe emotional distress.

WCJ Decision, April 30, 2001, Finding of Fact No. 18 at 5 and Conclusion of Law No. 2 at 6. The WCJ granted Claimant's petition and awarded benefits starting July 21, 1994.

The Board affirmed and concluded:

> Contrary to Defendant's [Employer's] argument, this case is distinguishable from Guaracino where there was only a single incident of rude or uncivilized behavior in the newspaper trucking industry. The court noted that "[w]here, as here, the evidence demonstrates that the offensive behavior complained of is an isolated incident, we must conclude that an abnormal working condition has not been established." [Philadelphia Newspapers, Inc. v. W.C.A.B.] [(]Guaracino[)], 554 [544] Pa. [203] at 215, 675 A.2d [1213] at 1219 [(1996)]. See also Grimes v. WCAB (Proctor & Gamble, Inc.), 679 A.2d 1356 ([Pa.Cmwlth.]1996) (which distinguished Guaracino on the basis that

---

5. Pursuant to this Court's order of November 22, 2002, the Board certified Dr. Berschling's depositions to the Court as a supplemental original record.

in that case there was not an isolated incident, but actions which constituted a continuing destructive presence within the work place over an extended period of time). Conversely, here, there were three separate incidents within 8 days of each other and no indication that the conduct was going to stop. Based on the *content, intensity and duration* of the sexually explicit comments, the WCJ did not err in finding that the comments made by Mr. Rossi to Claimant created an abnormal working condition. (Footnote omitted and emphasis added).

Board Decision, August 28, 2002, at 6–7.

On appeal,[6] Employer contends that Claimant was not exposed to abnormal working conditions in Employer's Mine and is not entitled to benefits for his alleged psychiatric injury. In particular, Employer asserts that the off-color comments in the Mine did not constitute abnormal working conditions. This Court must agree.

In *Davis v. Workmen's Compensation Appeal Board (Swarthmore Borough)*, 561 Pa. 462, 479, 751 A.2d 168, 177 (2000), our Pennsylvania Supreme Court determined:

In the absence of more definitive guidance, we conclude that it is the nature of the injury asserted, not the presence or absence of physical symptoms, that is controlling. Accordingly, we hold that the standard to be applied to claims for workers' compensation benefits when the claimant asserts a psychic injury that has manifested itself through psychic and physical symptoms is the same standard that we articulated in Martin [v. Ketchum, Inc. 523 Pa. 509, 568 A.2d 159 (1990)]: *such a claimant must prove by objective evidence that he has suffered from a psychic injury and that the psychic injury is other than a subjective reaction to normal working conditions.* (Emphasis added).

■ In *Davis*, the Supreme Court essentially eliminated the prior distinction between mental/mental and mental/physical claims. Thereafter, any claimant who asserts a psychic injury must establish the psychic injury was other than a subjective reaction to normal working conditions.[7]

■ To determine whether actual working conditions are abnormal they must be examined in the context of the specific employment. *U.S. Airways v. Workers' Compensation Appeal Board (Long)*, 756 A.2d 96 (Pa.Cmwlth.2000). The question whether a claimant was subjected to abnormal working conditions is a mixed question of law and fact fully reviewable by this Court. *Jeanes Hospital v. Workmen's Compensation Appeal Board (Miller)*, 141 Pa.Cmwlth.308, 595 A.2d 725 (1991).

In *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino)*, 544 Pa. 203, 675 A.2d 1213

---

**6.** This Court's review is limited to a determination of whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, or whether constitutional rights were violated. *Vinglinsky v. Workmen's Compensation Appeal Board (Penn Installation)*, 139 Pa.Cmwlth.15, 589 A.2d 291 (1991).

**7.** Prior to *Davis*, a claimant alleging a mental/mental injury, that is, that a psychological stimulus caused a psychic injury was required to establish that the mental injury was caused by abnormal working conditions. A claimant alleging a mental/physical injury, that is, that a psychological stimulus caused a physical injury, was required to establish "(1) a psychological stimulus which causes a physical injury which continues after the psychological stimulus is removed; and (2) a disability, i.e. loss of earning power, caused by the **physical** condition...." *Old Republic Insurance Company v. Workers' Compensation Appeal Board (Mascolo)*, 726 A.2d 444, 449 (Pa.Cmwlth. 1999) (emphasis in original).

(1996), Andrew Guaracino (Guaracino) worked for the Philadelphia Daily News as a delivery truck driver.[8] On one occasion, Guaracino left the rear truck door open and a bundle of newspapers fell out. Guaracino requested credit for lost papers. When he reached the pick-up site Guaracino encountered his supervisors. The supervisors cursed him, "calling him 'motherf____' among other things." *Id.* at 208, 675 A.2d at 1216. They followed him to the next stop and cursed at him again, this time with respect to a union matter. The manager called Guaracino " 'a f____ idiot shop steward.' " *Id.* at 209, 675 A.2d at 1216. A referee [9] determined that the derogatory remarks and obscene language were abusive. Guaracino was awarded benefits after the WCJ found he sustained a psychic injury caused by abnormal working conditions.

The Board reversed and noted ". . . that a *single episode* of harassment or mistreatment does not constitute abnormal working conditions." *Id.* at 206, 675 A.2d at 1215 (emphasis added). This Court reversed the Board. Ultimately, our Pennsylvania Supreme Court reinstated the Board's reversal and reasoned:

In assessing whether work conditions are abnormal, we must recognize that the work environment is a microcosm of society. It is not a shelter from rude behavior, obscene language, incivility, or stress. While we do not suggest that insensitive behavior is socially acceptable in the work place, it is unrealistic to expect that such behavior will not occur. Where, as here, the evidence demonstrates that the offensive behavior complained of is an *isolated incident,* we must conclude that an abnormal working condition has not been established. (Emphasis added).

*Id.* at 215, 675 A.2d at 1219.[10]

In *Daneker v. Workers' Compensation Appeal Board (White Haven Center),* 757 A.2d 429 (Pa.Cmwlth.2000), Karen Daneker's (Daneker's) position was eliminated and she was assigned a different job title which resulted in a loss of seniority and a change in hours. When Daneker returned to work, after a work injury, she was shifted to yet another position. Further, *three* disciplinary charges were filed against her; ultimately, she was cleared. Daneker suffered a disabling major depression. She alleged her disability was the result of abnormal working conditions.

---

8. He was also a shop steward in the Teamster's Union.

9. Referees are now referred to as workers' compensation judges.

10. In *McKinney v. Workers' Compensation Appeal Board (Decision Data),* 564 Pa. 669, 770 A.2d 326 (2001), our Pennsylvania Supreme Court directed that "[t]he order of the Commonwealth Court is reversed based upon the decision in Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board, (Andrew Guaracino), 544 Pa. 203, 675 A.2d 1213 (1996)." Dorothy McKinney (McKinney) was called to her supervisor's office on January 19, 1992. After she entered the office, he locked the door, screamed at her, threw objects around the room, and threatened her. McKinney alleged that she suffered a work-related mental disability as a result of this episode. The WCJ found that the disability was caused by abnormal working conditions.

The Board reversed on the basis that McKinney described just one episode. This Court reinstated the WCJ's decision and determined that ". . . it is not the criticism that Claimant [McKinney] received, even for a matter not related to her work duties, that constituted an abnormal working condition, but the entire confluence of events that occurred to Claimant on January 19, 1992." *McKinney [v. W.C.A.B.],* 752 A.2d 928, 933 (Pa.Cmwlth.2000). Nevertheless, the Supreme Court reversed this Court's decision based on *Guaracino. See McKinney,* 564 Pa. 669, 770 A.2d 326.

This Court agreed with the WCJ that these events did not constitute abnormal working conditions:

> The WCJ found that Claimant's [Daneker's] job change, shift change, loss of seniority, tense relationship with her co-workers, and subjection to disciplinary action did cause her stress, but in today's volatile employment environment, these factors did not amount to abnormal working conditions. Based upon our independent review of the record, we must agree.

*Id.* at 433.

On the other hand, this Court has found that numerous episodes involving insults may give rise to abnormal working conditions, depending upon the situation and frequency. In *Archer v. Workmen's Compensation Appeal Board (General Motors)*, 138 Pa.Cmwlth.309, 587 A.2d 901 (1991), Larrastine Archer (Archer) claimed she was harassed by her supervisor when she was accused of not working even though she had finished her tasks. Archer believed she was singled out by the supervisor. The referee found that Archer was harassed up to *twenty* times per week. The referee awarded benefits, but the Board reversed. On appeal, this Court reinstated the referee's decision.

This Court agrees with the Board that content, intensity, and dura-

tion are relevant to a determination of abnormal working conditions. However, based upon our Supreme Court's precedent this Court is constrained to conclude the evidence fails to support a finding of abnormal working conditions in the present controversy. First, the medical evidence established Claimant had an injured psyche and was predisposed to mental problems. Second, this Court must also take into account the work environment. Although what occurred in the Mine is certainly crude and unacceptable, the evidence reflected that this was normal in the mining industry.[11] The bottom line is that Claimant experienced a subjective reaction to Rossi's comments. Third, as to frequency, Claimant cited *three* episodes when Rossi insulted him. However, the evidence established that the comments occurred over an eight-day period during Claimant's sixteen-year mining career with Employer. As in *Daneker*, these *three* episodes do not establish abnormal working conditions within the context of a claim for a psychic injury based upon the content, intensity, duration, and frequency of the incidents.

As our Supreme Court commented in *Guaracino*, "it is unrealistic to expect that such behavior will not occur," particularly in the rough and tumble coal mining industry.[12] This Court must conclude that any

---

11. The crude humor, with homosexual overtones, was common in the Mine. Ross, Claimant's co-worker, responded to the WCJ's query:

> JUDGE BLOOM: My point is ... you joke, you kid around and say, blow me, [sic] asshole and it's accepted. What's the difference between those terms and what Mr. Rossi said to Hoppy [Claimant]? Is there any difference?
> A. [Ross]: I guess not.

N.T. 8/14/96 at 39–40; R.R. at 75a–76a. Further, supervisors used similar vulgarity "across the board" with other employees. Claimant even told his co-workers that he

went out with a transvestite. N.T. 11/18/96 at 70; R.R. at 174a.

12. This Court believes that the factual situation in the present matter is distinguishable from *Zink v. Workers' Compensation Appeal Board (Graphic Packaging, Inc.)*, 828 A.2d 456 (Pa.Cmwlth.2003). There, Graphics Packaging, Inc. (Graphics) hired George Zink (Zink), a Vietnam veteran, under federal law that promoted employment opportunities for Vietnam War veterans. Zink petitioned for benefits due to an aggravation of a preexisting condition. He established that his PTSD was aggravated by working rotating shifts.

mental injury suffered by Claimant was a subjective reaction, and that Claimant failed to establish abnormal working conditions.[13]

Accordingly, this Court reverses.[14]

### ORDER

AND NOW, this 25th day of May, 2004, the order of the Workers' Compensation Appeal Board in the above-captioned matter is reversed.

FRIEDMAN, J., dissents and files opinion joined by LEAVITT, J.

LEAVITT, J., dissents and files opinion joined by FRIEDMAN, J.

DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. The majority holds that Ronald A. Hopton's (Claimant) psychic injury was *not* caused by abnormal working conditions because: (1) Claimant had an injured psyche and was predis-

posed to mental problems; (2) homosexual harassment is (normal in the mining industry); and (3) Claimant cited only three incidents of homosexual harassment over an eight-day period. (Majority op. at 12.) However, I submit that the majority's holding is contrary to case law and, moreover, ignores the credibility determinations and findings of fact made by the workers' compensation judge (WCJ).

Inasmuch as the majority presents a statement of the facts based primarily on evidence from the record, I present the following recitation of the facts based on the WCJ's findings. I also note here that the majority's statement of the facts omits *all* of the evidence, and *all* of the findings, which show that the homosexual harassment that occurred in this case is *not* normal in the mining industry.

During Claimant's military service in Vietnam from 1964 to 1967, he was propositioned by his commanding officer and other individuals in his unit.[1] (WCJ's

Graphics had knowledge of Zink's preexisting condition but still required him to work rotating shifts. Given the unique set of facts, this Court determined that Zink shouldered his burden of proving abnormal working conditions. The record here indicated that Employer was unaware of Claimant's prior psychiatric problems.

**13.** In *Supervalu, Inc. v. Workers' Compensation Appeal Board (Pettinato)*, 727 A.2d 1174 (Pa.Cmwlth.1999), Nicholas Pettinato (Pettinato), a dock supervisor, alleged that he sustained a work-related psychiatric injury. The WCJ found that Pettinato was abused and overworked on his job. Pettinato was awarded benefits, and Supervalu, Inc. (Supervalu) appealed. The Board affirmed.

This Court noted that Pettinato identified actual events which caused his psychiatric injury. Pettinato testified that he had to perform his duties plus those of a co-supervisor. However, this Court stated that "we agree with Employer's [Supervalu's] argument that even if the WCJ found Claimant's (Pettinato's) testimony to be credible, the conditions that

Claimant described do not constitute abnormal working conditions." *Id.* at 1177. This Court reversed the Board's order on the basis that insufficient evidence established Pettinato's psychic injury was other than a subjective reaction to normal working conditions. Here, as in *Supervalu Inc.*, this Court must reach the same conclusion.

**14.** This Court need not address Employer's remaining issues, i.e. whether Claimant's medical evidence was equivocal; whether Claimant was disabled from his alleged work-related psychiatric injury; and whether the WCJ erred when he failed to recuse himself.

**1.** Claimant presented the following testimony about the proposition of his commanding officer.

[My commanding officer] asked me for favors in return for amenities. I asked him what favors.... And he said, well, I want you to allow me to place myself upon your body [for] anal sex. If I ask you to do oral sex, I want you to do it.... If there's [other

Findings of Fact, No. 2.) After his discharge from the army, Claimant received treatment at a Veterans Administration hospital and graduated from college before starting to work in the coal mines in 1978. (WCJ's Findings of Fact, No. 2.)

3. On July 6, 1994, while working in the mine, the claimant had a conversation with *his supervisor,* Dominic Rossi and a co-worker, Allan Vozel.... Rossi told the claimant that he had a *nice butt, a real nice looking butt, and a nice set of legs.* The claimant told Rossi to stop these comments [which] ... made him shake inside and gave him flashbacks to his Vietnam experiences.[2]

Mr. Vozel confirmed in his testimony that Rossi kept "complimenting" the claimant about his *nice ass* and that Rossi kept saying, *I bet you're really easy Ron* and continued talking about Ron's *nice legs.* Vozel observed that the claimant was upset by the comments and that Hopton kept asking Rossi to stop making them. Vozel himself told Rossi to stop the comments. However, according to Vozel, Rossi kept it up.

4. A few days later in another incident, Rossi and another employee, Joe Ross, met with the claimant, and Hopton was told to get into the jeep by Rossi. Ross testified that Rossi told the claimant, *I'd like to bend you over a rail, over the jeep and fuck you in the ass until you bleed.* The claimant justifiably understood Rossi to be saying that he wanted to have anal sexual relations with him. The claimant told Rossi to stop and that he couldn't take this anymore. The claimant told Rossi, It's going to be a lot of blood on you and it's not going to be [my blood]. Rossi responded, *Well, you like it rough and bloody, I like it rough and bloody too. Come sit next to me. You sure got a nice pair of legs and a nice butt[;] we can have a good time Hoppy.* In spite of the claimant's clear statements to Rossi that he did not welcome such comments, was upset by them, Rossi kept making them.

5. Joe Ross, the other employee in the jeep with the claimant, was so affected by Rossi's statement that he asked Rossi if he was queer and told Rossi Don't you ever talk to me like that, I don't take that bullshit, joke or not, don't ever talk to me like that. Rossi responded

requests], I want you to do it. And it was at this point that I stood up, took the safety off the M–14, I was going to blow his ass away because I could not tolerate that at that point. I had seen [homosexual activity] in Germany and he wasn't about to do that to me and I wasn't about to do that to him in exchange for anything. And at that point, the CO put [a] gun to my head and told me, put the fucking safety back on, you son of a bitch, or I'll blow your fucking head off.... And he didn't give up until we banded together as a group and we got the bastard out of there.
(R.R. at 94a–95a.)

**2.** Claimant did not take these comments as a joke because, in 1992, Rossi had fondled him in a homosexual manner. (R.R. at 102a.) There were three other foremen on this catwalk, which was approximately two feet wide. And I was trying to get around them, so I can place these tools in a safe position where they wouldn't be tripped over. And as I was coming around Rossi close to the rail, I had my back to him, and he——this is tough here. *He grabbed a hold of me by my rear end, and stuck his little finger right up the anal cavity.*
Now, I didn't immediately drop them tools, because if I would've I'd have hurt myself and the others who were standing close by. So I moved to the area where I could put them down. And I walked right up to him, approximately two inches from his nose, and told him that if he'd ever do that again, I'm throwing him over the rail[.] I'm going to finish him. I'm going to zip him up, I'm going to put him in a body bag.
(R.R. at 124a) (emphasis added).

that he was just joking and that he knew that Hoppy gets mad and was teasing him.

6. A third incident between the claimant and Rossi occurred on July 13, 1994 at the mine surface. The claimant was called into Rossi's office where Rossi was conversing with Terry Rafferty, another employee. Rossi said in the presence of Rafferty and the claimant, *Roy, doesn't he had a nice pair of legs.* The claimant again requested for Rossi to stop the nonsense, that he couldn't take it, and left. Rossi said to him, *Oh, I know what it is, how would $5.00 do, would $5.00 do?* Clearly implying that he wanted to treat the claimant like a male prostitute and have anal intercourse with him. Terry Rafferty confirmed in his testimony that Rossi did make a comment about having nice legs and that Hopton kept requesting for Rossi to stop it.

7. The claimant testified that after the first incident that he was shaking inside and had a desire to zip Rossi up in a bodybag and that he felt degraded and dehumanized and was trying to fight off flashbacks from Vietnam.

During and after the second incident the claimant felt shame and humiliation and experienced flashbacks and saw Rossi and his commanding officer from Vietnam and was confused as to who he was seeing. He felt physical pain, tightening of his chest, short of breath, pain in his arms and one large migraine. He started to feel numb like he would explode. After the third incident, when Mr. Rafferty was present, the claimant felt flashbacks of his Vietnam experience and felt shaky and short of breath. He finished his workshift on July 13, 1994 but took some days off and was anxious and couldn't sleep or eat and lost weight. . . .

8. When he testified[,] Mr. Rossi admitted talking to the claimant in the manner described. Rossi was aware of a human resources *policy against harassment* and he was later *disciplined for violating that policy.* Rossi was told by his employer that the comments were unacceptable and such joking is not tolerated. Mr. Rafferty testified that the policy forbids abusive language.

9. Alan Vozel testified that there is some joking and horseplay in the mines but that when someone would ask that it be stopped, it would be stopped. The exception in the incidents between Rossi and the claimant [is] when Rossi refused to stop and continued to the aggravation of the claimant. *Joe Ross testified that he had never heard anyone being spoken to as Rossi had done to the claimant and that references to anal sexual relations were uncommon. He testified that the comments from Rossi to the claimant were beyond the normal scope of joking at the mines.*

10. Joe Plachta, co-worker of the claimant, testified that *the types of comments that the claimant was subject to from Rossi were uncommon and that Plachta had never been talked to in this fashion. He also testified that the comments made by Rossi were beyond the scope of the normal everyday horseplay.*

11. This [WCJ] is well aware . . . that a work environment is a microcosm of society and is not a shelter from rude, obscene or uncivil behavior. In the case at bar, the matters complained of by the claimant and the treatment and statements made to him by his supervisor, Rossi, go beyond mere crude and uncivil joking, but are a course of conduct meant to degrade, humiliate and upset the claimant. To this [WCJ], it is clearly a pattern of abnormal working conditions. This was established by the clear

testimony of fellow workers who described it as not the usual method of joking around.

(WCJ's Findings of Fact, Nos. 3–11) (emphasis added). In addition to these findings, the WCJ found from the medical evidence that Claimant had post-traumatic stress disorder (PTSD), or a paranoid personality disorder, which was aggravated by Rossi's behavior towards Claimant. (WCJ's Findings of Fact, No. 18.) Thus, the WCJ awarded benefits to Claimant. The Workers' Compensation Appeal Board affirmed the WCJ's decision, and I also would affirm.

## I. Injured Psyche or Predisposition

In reversing, the majority concludes that Claimant's psychic injury was *not* caused by abnormal working conditions because Claimant had an injured psyche and was predisposed to mental problems. Although it is true that Claimant had a pre-existing mental disorder, this is *not* a proper consideration in deciding whether Claimant's psychic injury was caused by abnormal working conditions.

Our supreme court has stated that to recover benefits for a work-related psychic injury caused by psychological stimuli, a claimant must prove by objective evidence that he or she suffered a psychic injury which is not just a subjective reaction to normal working conditions. *City of Pittsburgh v. Logan,* 570 Pa. 500, 810 A.2d 1185 (2002) (citing *Martin v. Ketchum, Inc.,* 523 Pa. 509, 568 A.2d 159 (1990)). Whether the claimant had an injured psyche or a predisposition to mental problems when he or she was exposed to abnormal working conditions is *not* an element of this rule of law.

Indeed, this court has held that, if a claimant with a pre-existing psychic injury presents objective evidence that abnormal working conditions have aggravated that

injury, the claimant is entitled to benefits. *See Zink v. Workers' Compensation Appeal Board (Graphic Packaging, Inc.),* 828 A.2d 456 (Pa.Cmwlth.2003) (*en banc*); *see also Kane v. Workmen's Compensation Appeal Board (Williamsport Automotive),* 107 Pa.Cmwlth.360, 528 A.2d 302 (1987) (stating that, in order to prove a compensable injury, a claimant with a pre-existing mental illness must prove that abnormal working conditions exacerbated the mental illness); *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation),* 81 Pa.Cmwlth.579, 474 A.2d 82 (1984) (stating that the claimant must prove that the work situation exacerbated his pre-existing neurosis, thereby rendering him disabled from mental illness).

In the *Zink* case, the claimant suffered from PTSD as a result of his experiences in Vietnam. The employer knew that the claimant needed to work the third shift to keep his PTSD in balance. However, the employer changed to a rotating shift schedule and required the claimant to alternate day shift, second shift and third shift. The new rotating shift schedule aggravated the claimant's pre-existing and non-work-related PTSD to the extent that he could no longer work. This court held that, because the employer was aware of the claimant's need to work the third shift and because the employer had accommodated the claimant in this regard for thirteen years, the rotating shift schedule constituted an abnormal working condition. *Id.*

Clearly, in *Zink,* the fact that the claimant had pre-existing and non-work-related PTSD did not prevent the claimant from receiving benefits. The only question was whether abnormal working conditions aggravated the claimant's pre-existing mental disorder. Likewise, here, Claimant's injured psyche should not prevent Claim-

ant from receiving benefits. If Claimant presents objective evidence that abnormal working conditions aggravated Claimant's pre-existing mental disorder, then Claimant is entitled to benefits.

## II. Abnormal Working Conditions

The majority also concludes that Claimant's psychic injury was *not* caused by abnormal working conditions because homosexual harassment is normal in the mining industry.[3] However, the WCJ did *not* make such a finding.

The WCJ found that references to anal sexual relations are uncommon at the mines and that Rossi's comments to Claimant went beyond the scope of normal horseplay and joking. (WCJ's Findings of Fact, Nos. 9–10.) The WCJ even found that there was an employer policy prohibiting comments like those made by Rossi to Claimant, and, in fact, Rossi was disciplined for his comments. (WCJ's Findings of Fact, No. 8.) Those are the findings of fact, and, in reviewing them, this court is limited to determining whether the record contains substantial evidence to support them. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Although the majority does not attempt to make such a determination, my review of the record indicates that there *is* substantial evidence to support these findings.

To the extent that the record contains evidence to support the contrary finding of the majority, i.e., that homosexual harass-ment is normal in the mining industry, the WCJ obviously rejected such evidence. In workers' compensation cases, the WCJ is the fact-finder, and, as such, the WCJ determines questions of credibility, resolves conflicts in the testimony and determines the weight to be given the evidence. *Arnott v. Workmen's Compensation Appeal Board (Sheehy Ford Sales, Inc.)*, 156 Pa.Cmwlth.167, 627 A.2d 808 (1993), *appeal denied*, 537 Pa. 624, 641 A.2d 589 (1994). In my view, the majority in this instance has exceeded its authority by usurping the WCJ's fact-finding power.

## III. Three Incidents in Eight Days

The majority also concludes that Claimant's psychic injury was *not* caused by abnormal working conditions because Claimant cited only three incidents of homosexual harassment over an eight-day period. Although a single isolated incident of offensive behavior does not constitute an abnormal working condition, *repetitive* harassment by a superior over a period of time *does* constitute an abnormal working condition.[4] *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino)*, 544 Pa. 203, 675 A.2d 1213 (1996).

Pennsylvania courts have not established a specific number above the number one which transforms multiple incidents of insensitive behavior into abnormal working conditions. To do so would be extremely

---

**3.** Psychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, we must consider them in the context of the specific employment. *Logan.*

**4.** In *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino)*, 544 Pa. 203, 215, 675 A.2d 1213, 1219 (1996) (emphasis added), our supreme court stated:

In assessing whether work conditions are abnormal, we must recognize that the work environment is a microcosm of society. It is not a shelter from rude behavior, obscene language, incivility, or stress. While we do *not* suggest that insensitive behavior is socially acceptable in the work place, it is unrealistic to expect that such behavior will not occur. *Where, as here, the evidence demonstrates that the offensive behavior complained of is an isolated incident, we must conclude that an abnormal working condition has not been established.*

difficult. Here, for example, a supervisor harassed an employee in a homosexual manner, and the employee asked the supervisor to stop. The supervisor did not stop but, rather, continued the harassment a few days later. Although the employee once again asked the supervisor to stop, the supervisor harassed the employee yet again after a few more days. With *no* indication that the supervisor would *ever* stop, **how many times** must the employee endure homosexual harassment before the harassment rises to the level of an abnormal working condition?

By reference to *Archer v. Workmen's Compensation Appeal Board (General Motors)*, 138 Pa.Cmwlth. 309, 587 A.2d 901 (1991), the majority suggests that, as a matter of law, "twenty" is the magic number. (*See* majority op. at 839.) However, as I explain below, the twenty instances of harassment that the claimant allegedly experienced in *Archer* were not even considered in this court's holding.

In *Archer*, the claimant testified regarding *two* specific instances of harassment, one on January 3, 1985, and another on March 19, 1985. The claimant also testified that, since October of 1984, she had experienced as many as twenty instances of harassment per week. The claimant did *not* produce any corroborating evidence, and the issue presented to this court was whether the claimant needed to produce corroborating evidence of the harassment. In deciding the issue, this court considered that, because of the highly subjective nature of psychic injuries, the cause of the injury must be adequately pinpointed. With that principle in mind, this court held that, because the claimant *described actual events*, it was possible to determine *without corroborating evidence* whether the claimant's psychic injury was merely a subjective reaction to normal working conditions. Having made that determination, this court concluded that the actual events described by the claimant constituted abnormal working conditions. *Id.*

What is significant here is that the claimant in *Archer* described only *two* actual events in a three-month period and that the claimant did *not* describe *any* of the twenty instances of harassment she claimed to have experienced weekly between October of 1994 and January of 1995. If *two* incidents of harassment from January to March of 1985 were sufficient in *Archer* to establish abnormal working conditions, then, certainly, Claimant established abnormal working conditions here by proving *three* incidents in eight days.

## IV. The 1992 Incident

Although I conclude that Claimant proved by objective evidence that he suffered a psychic injury from abnormal working conditions, to the extent that reasonable minds might disagree, I would remand this case for additional findings.

The record contains evidence that, in 1992, Rossi grabbed Claimant by his "rear end" as Claimant was walking by him with an armful of tools, and Rossi "stuck his little finger right up [Claimant's] anal cavity." (R.R. at 124a.) Claimant controlled himself, placed the tools in a safe location and told Rossi that if he ever did that again, Claimant would "finish him," "zip him up" and "put him in a body bag." (R.R. at 124a.) Rossi did not touch Claimant after that incident. (R.R. at 125a.) Sometime in 1993, Claimant sustained a crushed ankle injury in the course of his employment, and, as a result, Claimant was off work for approximately one year. (R.R. at 127a, 186a–87a.) Claimant returned to work on July 5, 1994, and Rossi's harassing comments began one day later on July 6, 1994. (R.R. at 128a, 135a, 187a.)

I submit that the WCJ should have made findings about the 1992 "finger inci-

dent" and about Claimant's one-year absence from work in order to provide a proper background for Rossi's comments. In light of Rossi's prior assault on Claimant, *nobody* in Claimant's position would have taken Rossi's comments as a mere joke.

Judge LEAVITT joins in this dissent.

## DISSENTING OPINION BY Judge LEAVITT.

I join Judge Friedman's dissent for two reasons.

First, I agree that the majority's decision cannot be reconciled with this Court's holding in *Zink v. Workers' Compensation Appeal Board (Graphic Packaging, Inc.)*, 828 A.2d 456 (Pa.Cmwlth.2003) (*en banc*).[1] The overriding principle in *Zink* is that the claimant's psychological injuries, caused by his service in the Vietnam War, were exacerbated or aggravated when Zink was compelled to work rotating shifts.... *Id.* at 460. Accordingly, in determining whether psychic injury was caused by abnormal working conditions, the preexisting psychological condition of the claimant must be considered. Stated otherwise, a psychologically fragile, or eggshell, claimant may be eligible for benefits whereas another psychologically stronger claimant may not. Here, Claimant's psychological condition rendered him more prone to psychic injury, or aggravation, as was the situation in *Zink*. Under *Zink*, Claimant is eligible for benefits.

Second, our precedent is not establishing clear principles in this area of the law.

The majority's holding will leave practitioners wondering whether Claimant has been denied benefits because his psychological injury was caused by words only or because the verbal abuse did not occur on enough occasions. If this Court is going to decide every abnormal working conditions case on the facts, then it should defer to the factual findings of the WCJ and the Board. I agree with Judge Friedman that absent a clearly articulated legal principle, such as words-only cannot cause a compensable injury, the majority is simply substituting its judgment for that of the factfinder. Here, it was found by the WCJ that the threats of homosexual assault, even in an underground coal mine, were not normal working conditions.

For these reasons, I dissent.

Judge FRIEDMAN joins in this dissent.

---

1. I dissented from *Zink* because our Supreme Court established in *Metropolitan Edison Co. v. Workmen's Compensation Appeal Board (Werner)*, 553 Pa. 177, 186, 718 A.2d 759, 764 (1998) that normal working conditions, such as requiring an employee to work a [rotating] eight-hour shift, [does] not constitute an injury under the Act. Further the employer's knowledge of the claimant's condition in *Zink* did not provide a basis for awarding compensation. A new collective bargaining agreement required all employees to work a rotating shift, and the employer was working with the union to establish an exception for the Claimant when he walked off the job.